(*Circuit Court of Cook County.*)
## People ex rel. Fitzpatrick and Cruice

### vs.

## John C. Cannon, Abel A. Bach, and Thomas F. Judge, Election Commissioners of the City of Chicago.

(March 23, 1907.)

1. PUBLIC POLICY ACT—REFUSAL OF ELECTION COMMISSIONERS TO COMPLY WITH PETITION THEREUNDER—REMEDY BY MANDAMUS—JURISDICTION OF CIRCUIT COURT. If the election commissioners arbitrarily in disregard of the provisions of the public policy law refuse to place a proper question signed by the requisite number of electors, upon the ballot, the circuit court has jurisdiction to compel them by mandamus to discharge their duty in that respect.

2. STATUTES—CONSTRUCTION OF, WHERE MEANING CLEAR—DUTY OF COURT. It is an elementary rule of construction to first look at the language of an enactment, and if, from the words used, the meaning is clear and plain, it is the duty of the court to declare the meaning of the law to be as the words indicate. In such a case, there is strictly no need for construction.

3. PUBLIC POLICY ACT—NUMBER OF PROPOSITIONS TO BE SUBMITTED—ORDER OF PRECEDENCE. The public policy law provides that but three questions may be submitted at any one election. Any number of petitions may be filed with the board of election commissioners, but only the first three in order of their *filing* can be submitted to the electors.

4. PUBLIC POLICY ACT—APPEARANCE OF MORE THAN ONE QUESTION ON ANY ONE PETITION. Under the public policy statute, while three questions may be submitted at one election, but one question can appear on any one petition. If a petition contains more than one question to be submitted, the whole is a nullity.

Petition for writ of *mandamus*. Heard before Judge Richard S. Tuthill. The facts are stated in the opinion of the court.

*Addison Blakely*, for petitioners.

*Frank D. Ayers*, for respondents.

TUTHILL, J.:—

The question I am called upon to decide in this case arises as to the proper construction of what is commonly known as the ''public policy'' law of the state enacted by the general

assembly, and approved May 11, 1901. (Hurd's Revised Statutes, 1905, page 967.)

The petition alleges that pursuant to this statute petitioners and many thousands (the required number) of other citizens of Chicago signed: "A certain petition known as the Emergency Referendum Petition a copy of which is attached to and made a part of the petition in which petition three questions are asked to be submitted, which are as follows:

First: "For the approval of ordinances substantially in the form of the pending ordinance (reported to the city council of the city of Chicago, on January 15, A. D. 1907) authorizing the Chicago City Railway Company and the Chicago Railways Company, respectively, to construct, maintain and operate street railways in said city, and providing for the purchase thereof by the said city or its licensee."

Second: "Shall the city council proceed by condemnation under the Mueller law to acquire and equip a complete, modern, unified street railway system with one fare and universal transfers for the entire city, instead of passing the pending franchise ordinance?"

Third: "Shall the legislature repeal the Sunday closing laws which forbid under penalty attending or taking part in amusements or diversions, maintaining open bars, and engaging in business or work on Sunday?"

It is alleged and conceded for the purpose of this hearing, at least, that the requisite number of signatures of electors are attached to said petition to require the submission of a question to the voters for their decision. It is further alleged that when this petition was presented to John C. Cannon, Thomas F. Judge and Abel A. Bach, election commissioners, they and each of them refused and still refuse to print said three propositions, or either or any of them upon the ballot at the election, April 2, 1907, "in accordance with the tenor of said petition, and in pursuance of the duty imposd upon them specifically by the provisions of said public policy act, which said refusal is incorporated in an opinion by said commissioners rendered by them on the 21st day of February, 1907, a copy of

which is attached hereto and marked Exhibit B. to which formal exception and protest was then and there made by attorneys for these petitioners."

The writ of *mandamus* is herein prayed to compel the placing of said above-mentioned three questions contained in said petitions upon the ballot by said election commissioners.

If the election commissioners have arbitrarily, in disregard for the provisions of the law, refused to place said propositions upon the ballot, then I am of the opinion that this court ought to issue its writ of *mandamus* to compel them to discharge the duty which the statute imposes upon them in this respect. Was the petition a valid and legal petition? This involves this other question: Does the law permit more than one question to be signed for by petitioners upon one and the same petition?

An elementary rule of construction is first to look to the language of an enactment, and if, from the words used, the meaning is clear and plain, it is the duty of the court to declare the meaning of the law to be as the words used indicate. In such case it is not needed to go further in citing other rules of construction, for there is no need of construction. This law declares that "on a written petition signed" etc., "it shall be the duty of the proper election officers in each case to submit any question of public policy so petitioned for" to the electors, etc. "Provided, such petition is filed with the proper election officers in each case not less than sixty days before the date of the election at which the question or questions petitioned for are to be submitted. Not more than three propositions shall be submitted at the same election, and such proposition shall be submitted in the order of its filing."

The right secured in the organic law, section 17, article II, Bill of Rights, to the people "to make known their opinions to their representatives and to apply for redress of grievances," will in no way be denied or frittered away by technical and subtle reasoning. At the same time it was most proper for the representatives of the people in the legislative body to provide an orderly and appropriate method whereby the opinions of the people might be definitely and clearly made known to their

representatives, so that frauds upon the people themselves might not be made easy or possible of perpetration. It was most necessary and proper to guard the exercise of this important right of the people so that the people should not themselves be deceived or misled and made to seem to ask for that which they did not in fact intend or desire. In order to enable the voter to express his wish, the issue presented to him should, so far as is practicable, be segregated from others, for it is only possible for him to give an affirmative or negative answer, "Yes" or "No", and by a cross opposite the question he is to answer by his vote to signify his wish. In order that the voter should not be confused and thus fail to express his real wish, the legislature wisely limited the number of questions which might be submitted at any election to three, and by requiring the petitions to be signed by 25 per cent. of the registered voters.

But these are not the only things which are required. All the words of a statute are to be considered and given weight in determining the scope and meaning of the law. The three questions to be submitted are, I may state, distinct and may be, usually are, incongruous. There is no limit to the number of petitions which may be presented to the election commissioners and *filed.* Any one interested may present a proposition, and if it has the required signatures, he may present it for "filing." When the time within which petitions may be submitted has expired, then the duty of the commissioners is to consider:

First. The *order of the filing of the petitions according to* the dates when presented; for the law declares that, "such" (each) *"proposition shall be submitted in the order of its filing."*

It is argued that the provisions of the law will be complied with if the "propositions" are submitted in the order in which they are placed on the petitions. But this is not what the law says. The "filing" is the fact which the law declares as fixing the order of submission, and neither the commissioners or even the court has a right to declare "that any other fact shall be considered in order to determine the order of the submission of the three propositions."

It seems to me that this consideration is conclusive of the contention in this case, namely: that only one proposition can be presented in one and the same petition. A consideration of other words in the law, however, sustains this view. It is declared to be the duty of the election officers "in *each* case to submit *any question*." Had the legislature intended that an unlimited number of questions, or that more than one question could be petitioned for in one and the same petition, why did they say "any question," using the singular number, rather than the plural, questions? The mention of one is the exclusion of the other.

It is ingeniously argued that the use of the words "question" or "questions" in the proviso indicated that more than one question might be petitioned for in one and the same petition, but I am wholly unable to take this view. It is true the law permits the submission of three questions by the election commissioners. There might be only one question and only one petition to submit, and therefore it was necessary in case there was more than one question, and more than one petition, to make the requirements found in the proviso apply to all as well as to each, to "questions petitioned for" as well as to "a question petitioned for."

The petitions on which are found the three propositions which it is sought to have placed on the ballot well illustrate the danger and evil which the legislature sought to avoid, as it appears to me, by requiring that only one proposition should be submitted in any one petition. The voter might wish to vote for one of these propositions, but might, and in many cases certainly would, wish to vote against another. Again his interest in one might be so great that in order to promote that he would even sign a petition containing another which he was in truth opposed to, or when his signature was requested, his attention only be called to the proposition he approved, and the one he did not approve would be kept in the background. Thus a vicious and hurtful practice, known in legislative bodies as log rolling, would inevitably be resorted to. So, instead of a petition truly representing the wishes of the signers and making known their opinions to their representatives, it would in very many cases have an opposite ef-

fect, and thus tend to defeat the only legitimate and proper
object of the public policy law.

The language of the law seeming to be clear and conclusive
as to the legislative intent, it is perhaps not needed that I
should discuss or refer to authorities bearing upon the con-
tentions of the learned counsel on each side of this case. The
case of *Supervisors of Fulton County v. The Mississippi &
Wabash Railroad Co.*, 31 Ill. 338, 373, is so much in point
and so clearly expresses my own views as to the questions
herein involved, and which ought to and no doubt did in-
fluence the legislature in the enactment of this law, that I will
close by quoting from the opinion of Justice Breese, one of
the first and ablest judges who, on the bench of the Supreme
Court, has declared the law in our state, and given reasons
therefor which have been approved by jurists, statesmen and
patriots as based upon good morals, sound reasoning, a pro-
found regard for the welfare of the people, and the perpetuity
of a government by the people. He said:

"The order made by the Board of Supervisors of Fulton
county under this law, does not seem to be in strict conformity
to it. The law evidently contemplates a vote for or against
subscription, to some one company, only, specifying the com-
pany. The order is for a subscription to the Mississippi and
Wabash River Railroad Company, and the Petersburg and
Springfield Railroad Company, seventy-five thousand dollars
to each.

"This is not only not pursuant to the law, but is manifestly
unfair. All elections, as well for measures as men, should be
perfectly free, uninfluenced by any consideration, other than
the merits of the individual man or measure proposed. We
boast of the freedom of the elective franchise, should we not
strive to swell the boast by its purity also? A single, isolated
measure, such as a railroad, may not unite a majority of a
county to whom it is proposed. It may favor, if constructed
one portion of a county more than another, and thereby be
prevented from receiving a clear majority vote, such as the
law clearly contemplates shall be given. Is it fair, in order to
accomplish this object, to attach another measure to it, to

be voted on at the same time, which may benefit the opposing portion of the county? The law never intended that two roads should be coupled together, and the people forbidden to vote for the one if they did not also vote for the other, the one road being really a bribe offered for votes for the other. The truth is the voters of Fulton have never had an opportunity to vote, and never have voted this subscription, for the question was at no time distinctly before them. The question before them was, will you vote for a subscription to two roads? Neither road has received the approving vote of the people, and until that is done, until the naked single question shall be fairly presented to those voters, they ought not to be bound, or injuriously affected, by any such jockeying management and log rolling. By this system, condemned as it has always been, by the moral sense as well as sense of justice, of the whole country, it should at this day find no favor in the courts. We do not hesitate to say, this proposition to vote on two roads at the same time, was not authorized by the law, and is a fraud on the people.

"This tacking one measure upon another is unjust in another view, as it gives the county court power to weigh down a popular single measure, by attaching odious measures to it, and this virtually depriving the people of their right to vote on the one measure the success of which would greatly promote their interests.

"Such maneuvering should be condemned everywhere as unfair and unjust, and we so regard it. The order made by the board of supervisors, in thus obtaining the vote of the people, is considered as unauthorized by the act.

"The decree of the circuit court is reversed."

The language of the supreme court of Colorado, in *Denver v. Hayes,* 28 Colo. 110, 63 Pac. 311, is also directly in point.

The order of the court will be that the writ of *mandamus* prayed for in this petition is denied.